# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Purple iPhone 14 Pro Max Cell Phone<br>Seized as FP&F No. 2024565300028701 Item 0002 | )<br>)<br>)  Case No.  '24 MJ2439 AHG<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the   Southern   District of   California  , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, United States Code § 1324, Title 18 United States Code § 111 | Transportation of Illegal Aliens (a)(1)(A)(ii)<br>Assaulting, Resisting an Officer (a)(l) |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Aaron Sells, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Georgina Hayslip*
Applicant's signature

Georgina Hayslip, Border Patrol Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
  telephone   *(specify reliable electronic means)*.

Date:   06/26/2024  

*Allison H. Goddard*
Judge's signature

City and state:  San Diego, California     The Honorable Allison H. Goddard, U.S. Magistrate Judge
Printed name and title

# ATTACHMENT A
## PROPERTY TO BE SEARCHED

The following property is to be searched:

Purple iPhone 14 Pro Max Cell Phone
Seized as FP&F No. 2024565300028701 Item 0002
**("Target Device")**

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, Asset Forfeiture Office, San Diego Sector, in San Diego, California.

## ATTACHMENT B

ITEM TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **April 12, 2024, through June 12, 2024:**

a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device(s)**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which is evidence of violations of Title 8, United States Code, Section 1324.

# AFFIDAVIT

I, Georgina Hayslip, a Border Patrol Agent with United States Homeland Security, Customs and Border Protection, United States Border Patrol, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for warrant(s) to search the following electronic device(s):

> Purple iPhone 14 Pro Max Cell Phone
> Seized as FP&F No. 2024565300028701 Item 0002
> **("Target Device")**

("**Target Device**"), as further described in Attachment A to seize evidence of a crime, specifically, violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii), transport an alien who is unlawfully present in the United States, and Title 18 United States Code, Section 111, assault on a federal officer, as further described in Attachment B.

2. The requested warrant related to the investigation and prosecution of Samantha Alize DELGADO Perez for transporting and moving illegal aliens within the United States. The **Target Device** is currently in the custody of Department of Homeland Security, Customs and Border Protection, Asset Forfeiture Office, San Diego Sector, in San Diego, California.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all my knowledge of the investigation into this matter. Dates and times are approximate.

1

## TRAINING AND EXPERIENCE

4. I am a United States Border Patrol ("USBP") agent with the Department of Homeland Security, Customs and Border Protection. I have been employed as a full-time, sworn federal agent with the USBP since January 16, 2001, having graduated from the USBP Basic Border Patrol Training Academy located in Charleston, South Carolina in May of 2001. The Academy curriculum covers specialized training in the Immigration and Naturalization Act (INA), criminal law, and statutory authority, as well as cross-training in Title 21 of the United States Code (Controlled Substance Act (CSA) violations) and Title 19 of the United States Code (customs law violations). I have been trained in investigating various violations of federal law, including alien smuggling, narcotics smuggling, weapons smuggling, and bulk currency smuggling. I have also worked with and learned from other agents and criminal investigators with extensive experience in these investigations.

5. As a Border Patrol Agent (BPA), I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedures, that is, a government agent engaged in the enforcement of the criminal laws of the United States, and thereby authorized to request issuance of federal search and seizure warrants. As an agent with the Border Patrol, I investigate violations of Immigration and Nationality laws (Title 8, United States Code), including alien smuggling in violation of Title 8, United States Code, Section 1324, and related offenses.

6. During my career, I have participated in the investigation of a number of cases involving the smuggling of undocumented aliens from Mexico into the United States and the transportation of undocumented aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and foot guides.

7. I am currently assigned to the San Diego Sector Anti-Smuggling Unit (ASU). ASU is tasked with investigating, arresting, and prosecuting alien and drug smuggling

organizations that utilize the Southern and Central Districts of California as an operational corridor. ASU is also tasked with investigating narcotic smuggling, bulk cash smuggling, and assaults on federal officers, theft and damage of government equipment, escapes from federal custody, and a variety of other federal and state offenses.

8. During the course of employment with USBP, I have arrested more than 250 individuals in connection with alien smuggling crimes. I have also participated in longer-term investigations including, but not limited to alien smuggling investigations, that have resulted in criminal prosecutions. Through these experiences, I have become familiar with the activities of those who coordinate smuggling events and the practices employed by the drivers/smugglers locally and abroad, including recruitment methods, transportation methods and tactics used to communicate with the drivers and avoid detection by law enforcement.

9. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and undocumented alien transporters, particularly, those who attempt to smuggle undocumented aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and drivers to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the geographical location of illegal aliens and drivers, providing instructions to drivers, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

10. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the

3

arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

11. Based upon my training, experience, and consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.

12. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device(s)**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

13. On June 11, 2024, Border Patrol Agent (BPA) A. Sells was performing his assigned duties in the Brown Field Border Patrol Station area of responsibility. BPA Sells was in plain clothes with an agency-issued vest bearing a Border Patrol badge and agency insignia visible.

14. At approximately 8:36 PM, National Guard scope operators advised over service radio that they had observed a suspicious vehicle parked on the south side of State Route 94 (SR-94) in an area known to Border Patrol Agents as "Harvey Dennisons." National Guard scope operators then advised that they then observed an individual emerge from a ditch and enter the vehicle. The vehicle then made a U-turn and drove west on SR-94.

15. Moments later, Supervisory Border Patrol Agent (SBPA) M. Munoz advised agents that he saw the vehicle in question and stated that it was a teal Infiniti G35, which was later determined to be a silver Infiniti G35 bearing California license plates. SBPA Munoz requested record checks on the vehicle which revealed that the vehicle was

5

1 registered in Compton, California to an individual later identified as defendant Samantha Alize DELGADO Perez. At this point, BPA Sells was able to get behind SBPA Munoz and follow the vehicle. SBPA S. Collins also advised over service radio that he was positioned west of their location on Community Building Road and prepared with a Vehicle Immobilization Device (VID) if necessary.

16. At approximately 8:44 PM, SBPA Munoz conducted a vehicle stop on the Infiniti, which yielded approximately 20 yards away from SBPA Collins' location. As SBPA Munoz began to question DELGADO, he could see that there was an individual attempting to conceal himself between the front and back seats along the floorboard. SBPA Munoz ordered DELGADO to turn off the vehicle several times. DELGADO finally complied with the commands. SBPA Munoz then advised the individual on the floorboard not to move in the Spanish language. At this point, DELGADO restarted the vehicle. SBPA Munoz attempted to remove DELGADO from the vehicle, and as he was doing so, DELGADO put the vehicle in drive and accelerated. As the vehicle drove west, SBPA Munoz was still partially inside the vehicle. SBPA Collins deployed the VID. The Infiniti struck a dark grey Tahoe at such a speed that the Tahoe struck SBPA Collins. As other agents arrived on scene, DELGADO was ordered to stop and get out of the vehicle. DELGADO did not comply and continued to drive west. SBPA Munoz was able to free himself from the vehicle as DELGADO drove west.

17. Moments later, DELGADO crashed her vehicle into a berm and attempted to flee on foot. BPA M. Rangel gave chase and ordered DELGADO to stop, which she complied. At approximately 8:47, BPA Sells approached DELGADO and placed her under arrest. BPA Sells then returned to the Infiniti and conducted an immigration inspection on the individual that was laying on the floorboard. The individual, later identified as material witness Emmanuel RAZO-Juarez, stated that he is a citizen and national of Mexico without any documents allowing him to enter or remain in the United States legally.

18. At approximately 8:51 PM, BPA Sells placed RAZO under arrest. At the time of arrest, a Purple iPhone 14 Pro Max Cell Phone **(Target Device)**, was found by BPA Marco Danjer on the ground at the location in which DELGADO crashed into SBPA Collins' Tahoe.

19. The defendant, Samantha Alize DELGADO Perez, was advised of her Miranda Rights. DELGADO stated she understood her rights and was willing to answer questions without an attorney present. DELGADO was shown the **Target Device.** DELGADO claimed the **Target Device** as hers. This device was subsequently seized. DELGADO granted consent for her phone to be searched and signed a CBP Consent to Search Electronic Devices Form. DELGADO stated she made arrangements through an unknown individual, via WhatsApp and Instagram to smuggle individuals from the United States/ Mexico border to the Los Angeles, California area. DELGADO stated she was paid $2,000 USD per individual successfully smuggled. DELGADO also stated that in the month of May or April, she successfully smuggled one individual via this same method and was paid $2,000. DELGADO stated she was paid in cash by a man wearing a ski-mask in a Burger King parking lot. DELGADO stated she contacted an individual via Instagram requesting "work." DELGADO stated she received a location and instructions to pick up an individual in the San Diego, California area.

20. DELGADO stated she arrived at the location at approximately 8:00 PM, pulled over onto the side of the road, and waited for approximately 20 minutes before an individual entered her car. DELGADO stated she believed the individual was "illegal." DELGADO stated she drove for approximately 20 minutes before noticing a "cop car's emergency lights." DELGADO stated she pulled over and the Agent approached her driver side window and instructed her to turn the vehicle off and step out. DELGADO stated she turned the vehicle off and wanted to know why she was being stopped. DELGADO stated after the Agent opened her door, she entered "panic mode," started the car, and stepped on the gas. DELGADO stated the Agent had his arm around her neck and she could not see.

DELGADO stated she felt a bump or nudge and then heard the Agent say "Ouch, my leg." DELGADO went on to state that she stopped the vehicle and began to run. DELGADO stated she ran for a short distance before falling and was subsequently arrested.

21. Material witness, Emmanuel RAZO-Juarez, stated he is a citizen of Mexico and does not possess documentation to enter or remain in the United States legally. RAZO stated he made smuggling arrangements to pay a fee of $8,500 USD upon successfully reaching his intended destination of Las Vegas, Nevada. RAZO stated he was being guided by an individual via cell phone. RAZO stated he walked for approximately three hours until he reached his pickup location. After waiting for several hours, RAZO stated a gray sedan arrived at approximately 8:00 PM. RAZO stated he heard a female begin to shout and honk the horn. After approaching the sedan, RAZO explained that the female driver told him that a friend sent her to pick him up and instructed him to get in the sedan. RAZO stated he was sent a photo of the sedan shortly after entering the vehicle, confirming he was in the right vehicle.

22. RAZO stated they drove for approximately 10 minutes before they noticed a Border Patrol truck behind them. RAZO stated they continued for an additional minute or so before the Border Patrol truck activated its lights and sirens. RAZO stated the driver pulled the vehicle to the side of the road and uniformed Border Patrol Agents approached the vehicle. RAZO stated that the driver instructed him to hide, and he laid across the back seat without a seatbelt on. RAZO stated that the female driver became argumentative after Agents instructed her to get out of the vehicle. RAZO stated he repeatedly tried to tell the driver to calm down and comply. RAZO explained that the driver accelerated at a high rate of speed and struck an SUV. RAZO stated that one of the Agents had their upper body in the vehicle while his legs were hanging out of the sedan during the acceleration and collision. RAZO stated the female attempted to push agents away and accelerate again, but could only drive a short distance, due to the flat tires. RAZO stated the female exited the vehicle and began to run, while he remained inside and was placed under arrest.

23. Based upon my experience and training, consultation with other law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Device**.

24. Based on the above facts, my experience and training, there is probable cause to believe that defendant Samantha Alize DELGADO Perez was using the **Target Device** to communicate with others to bring in and further the illegal entry of illegal aliens into the United States. DELGADO Perez, as noted above, told law enforcement agents she had previously smuggled illegal aliens in April or May. Accordingly, I request permission to search the **Target Device** for data beginning on **April 12, 2024, through June 12, 2024.**

## METHODOLOGY

25. It is not possible to determine, merely by knowing the cellular telephones make, model and serial number, the nature, and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants, and have functions such as calendars and full address books and can be minicomputers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.

26. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if

some of the stored information on the device may be acquired forensically, not all the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

27. Following the issuance of this warrant, a case agent familiar with the investigation will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

28. Based on the foregoing, identifying, and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days from the date this warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

29. Law enforcement previously attempted to obtain the evidence sought in this warrant. DELGADO gave both written and verbal consent to search the **Target Device**. Agents attempted to extract data from the **Target Device** on June 12, 2024. This first attempt extracted some data, but it was not completely successful.[1] Accordingly, agents are seeking this warrant to make another attempt.

---

[1] No information from this first extraction was relied upon to establish probable cause for this warrant application.

10

# CONCLUSION

30. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of alien smuggling violation of Title 8, United States Code, Sections 1324.

31. Because the **Target Device** was seized at the time of DELGADO's arrest and has been securely stored since that time, there is probable cause to believe that such evidence continues to exist on **Target Device**. As stated above, I believe that the appropriate date range for this search is from **April 12, 2024, through June 12, 2024.**

32. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachments A and seized the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Georgina Hayslip*
_____
Georgina Hayslip
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 26th day of June 2024.

*Allison H. Goddard*
_____
Allison H. Goddard
United States Magistrate Judge